Good morning, Your Honors. Susan Alexander on behalf of the Employees Retirement System of the State of Hawaii. This case involves dismissal at the pleading stage of securities claims related to the classic difference between Whole Foods' public statements about transparency and the importance of their relationship of trust with their customers, while on the other hand continually overcharging for prepackaged perishable goods by including the weight of the packaging and the weight of the air in the price that was charged in the checkout price. Over five years in two of Whole Foods' largest markets, California and New York, after repeatedly being caught and after signing court documents agreeing to change their practices. This is a suit under the Exchange Act, right? Yes, it is. And the PSLRA, yes. What specifically is the claim with respect to the accuracy of the financial statements? There is a claim about that. That's a key claim here, right? Absolutely. And that is the most straightforward way to reverse on falsity, because the financial statements on revenues and earnings included those overcharged prices in violation of GAAP. Well, then let me ask, what is the evidence on what GAAP requires in this situation? Sure. Let me just give you an example. Let's assume that Whole Foods sold chicken at $10 for the package, and they should have only charged $9. So they overcharged $1. And let's say that happened quite a few times in California and New York. So what does the record reflect, generally accepted accounting principles, would tell you about how that problem should be recorded, should have been reported in the financial statements? Absolutely. Accounting Standards Codification 605-10-25-1, this is at Paragraph 127 of the complaint. That accounting standard says that revenues are earned once the entity, that's Whole Foods, has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. So in your example, if the package of chicken says chicken is X dollars per pound and there's enough weight in here for us to charge you $10, but actually there's only $9 worth of chicken in the package. And you should have only recorded $9. Correct. Okay, so now, but this is after the fact. And all these customers paid the $10. That's the problem. What is the generally accepted accounting principles that relate to what happens when you record $10 and for some number of people, you have offered to pay them and maybe even owe them that dollar back. So what does GAAP require on this record? And I'm always talking about this record. What does GAAP require on this record about what you do when you've reported $10 and you should have only reported $9? What you do is you only recognize revenues on the $9. But they've already recognized revenues on the $10, so what do you do then? Well, they haven't, though. I mean, that's where the problem is. They may have collected the $10, but the decision, Whole Foods' decision about what to state as earned revenues, that's what's governed by GAAP. So it's not that they took in the $10. It's what they're allowed to recognize as revenue. All right. Let's assume that, and they would probably agree with you, we shouldn't have reported that dollar. But what does GAAP require in that situation? We've reported $10. We've put out our, who is it, Deloitte? Who is it here? I don't know. Whoever the accounting firm was. They've signed off on our statements. We've reported $10. We should have only reported $9. What does the record reflect? Generally accepted accounting principles would require them to do in that situation, having reported $10 inaccurately. Your Honor, I think you're a step ahead of where this complaint is. So I think you might be talking about, are there procedures under GAAP for a restatement, which is not required in order for us to state a claim? Our claim isn't about what to do to fix the problem. Our complaint is about the fact that their revenue and earnings statements over the entire class period, each quarter and each year, were materially false because they were in violation of GAAP. And what is your evidence in this record that their financial statements, reporting it at $10, were materially false? Right. So it's paragraphs 124 to 127 of the complaint. There's the accounting standards codification, citation 605-10-25-1 that I gave you, and there's also... Well, when it came to Whole Foods' attention at the top of Whole Foods, as distinguished from whatever the operating people were, when it came to their attention that this had happened, and they still, they did not restate their financials, what evidence is there that this was not in accordance with GAAP, that the statements that came out... And by the way, all these statements are generally historical. I mean, you report this year and last year, and it's all comparative. Right. So now I think you're talking about two different things. So I just want to separate it. Under the PSLRA, and it's a heightened pleading requirement, I get that. But for falsity, all we're required to do is identify the statements with particularity, and identify why they're false with particularity. So we have identified each of the quarterly cues in each of the annual 10-Ks that made false statements about revenues and earnings. That doesn't have anything to do with intentionality. That's just identifying the statements with particularity, and we've identified why false, because we've identified the GAAP rules that say those revenues can't be recognized as revenues or earnings unless they're actually earned. So that's falsity. Then you're separately talking about what did Whole Foods know. And what Whole Foods knew is what John Hempfling knew. So John Hempfling was Whole Foods' designate. He's the global litigation counsel. He was Whole Foods' designate throughout the California investigation, which started before the class period and continued through the class period. I still do not have an answer about what generally accepted accounting principles would have required Whole Foods to do when they finally, you know, the light bulb flashed at the upper reaches and also in their accounting firm. What were they supposed to do at that point? They did not restate their revenues. Why? Why was that? What did generally accepted accounting principles require them to do at that point? Right. So I want to be really clear about the restatement. And again, I think you're at step two, and our complaint is about step one. No, I'm interested in your complaint. Okay. Our complaint is about their false statement in the first instance. What they do to correct it or choose not to do is within their hands. No, it isn't. Well, it is because the reason that the First Circuit in Aldridge held that we do not have to plead a restatement by a company in order to plead that their statements were false in the first instance is because it would... You do have to plead why these statements were materially false. And the reason they weren't materially false is in paragraphs 124 to 127 of the complaint. It's two different GAAP provisions that say where they have not... Where the money they collected isn't based on the specific nature and terms of the agreed upon transaction, so it doesn't weigh what they said it weighed, or where the money doesn't entitle them to the benefits represented, then those dollars are not earned, and they cannot be recognized as revenue. So the statements recognizing them as revenue are false. What they do about it later is a second part. No, the statements are not false unless the amount by which the gross revenues were overstated is somehow material. Perhaps the answer is, I don't know. I mean, I'm only suggesting, just asking. Well, okay, so we had a dollar that we really owed this woman back for the chicken. And there are X number of... It's always women buying chicken. X number of women representing Y number of dollars who are entitled to get the Y number of dollars back. What does GAAP require in that situation? For instance, I can understand that you might say, well, you have to set up a reserve. So if you owe these women a dollar apiece or times whatever they pay, then you have to create a reserve. But apparently that's not the claim. That is not what I'm saying, no. So there's sort of two questions. One is you're asking, was it a material amount? Were the false financial statements materially false? And we know they were, because Whole Foods talked about the importance to the company of their transparency and their accuracy and their relationship of trust with their customers. They said that pricing accuracy was material. So your case depends upon those statements. It does not. It depends upon the glorious statements that the company made about how we are. The case does not depend on that. We assert that they are false in and of themselves and they show the materiality of the financial statements. But the financial statements are false in and of themselves. I still, you still have to establish what, I mean, you know, in this world that we live in, the accountants and generally accepted accounting principals will tell you what you have to do in that situation. And you, the plaintiff, you have to be able to say, we established that under GAAP, we provided an affidavit or whatever, that under GAAP they should have recorded, their financial statements, which reported X amount of revenues, should have include, which they received. This isn't a case where they didn't get the money. They have the cash. So the question is, we should have booked a reserve or something. None of that is in here. It's not about a reserve. What they should have done, what Whole Foods should have done, is Whole Foods should have recognized the revenues that were actually earned in accordance with GAAP. They should not have recognized revenues that were not earned in accordance with GAAP. Regardless of whether the revenues that were not earned are material on these statements, that doesn't matter. If they reported $10 and they should have reported $9, that's it. There's not dispute about materiality. This is an issue that was pursued in California for more than two years and resulted in a consent decree and a requirement that Whole Foods change its practices. It was pursued in New York, again for two years, with the CEO Rob's involvement and Global Litigation Council Hempfling's involvement for, admittedly, at least six months before the consent decree was filed. Again, an admission of overcharging and an agreement to make company-wide changes. So there's really not an issue about materiality here. The issue on falsity... Yes, there is, about the financial statements. You've set this case up in part, and I recognize it's only in part, that the financial statements were materially misleading. The burden is on you to establish that under GAAP, these financial statements were materially misleading. I still don't understand why. $1 per package times X number of packages. The $1 is your hypothetical. The actual facts show that they were charging significantly more for packages, and what we have is we have defendants' own documents. For color, for an example of where discovery will lead in this case, we have defendants' own declarations in the Southern District of New York where they demonstrated, just in New York City, that this amounted to enough to establish jurisdiction for the consumer claim there. So they submitted conservative declarations based on the most conservative estimates that totaled $9 million for New York City, extrapolating from that in California, which is a much bigger market for Whole Foods, and New York. And that's only those two states alone. In those two states, the extrapolation gets to $127 million. So materiality is... The other reason that it's material, and it doesn't make the case dependent on the falsity of those statements, but defendants admitted that their price accuracy, their transparency, their trust relationship with their customers was material to them. So it's material for that reason as well. Okay, so I'm sorry I've taken so much. I'm going to give you a couple more minutes and give the other side a couple more minutes. Can you discuss the loss causation issue that the district court relied on? Absolutely. I think the district court's analysis of loss causation was essentially, the district court didn't believe there was a false statement and so there was no truth to be revealed. But if falsity is... You said it did not reveal any new information on the July 29th call. Right. What was revealed was the financial impact to Whole Foods of having violated its customers' trust, in exactly the same way that this court in a metasys said that where Medicare violations had been previously disclosed, but the financial impact had not yet been revealed. Revelation of the financial impact is approximately caused enough for loss causation when it's planned under Rule 8, Notice Pleading Standard. Other than these fairly minimal fines that they've paid, have they had to pay any consumers anything? Not as far as I know. Okay. So the financial impact has been more the Twitter shaming results than the actual, like, now we've got to go pay back the chicken buyers. No, it's not Twitter shaming. The financial impact is what they had to admit on July 29th, 2015, reduced revenues and earnings because of reduced traffic for exactly the reason that they always said this was going to be material because... Now I'm going to get it for nine. That sounds good to me. I'm going to go buy me some more. If instead people go, wow, I don't want to go to Whole Foods anymore, that is the Twitter shaming impact. It's not that these consumers that were owed the money that we're talking about, that you exchanged with Judge King about, are coming in and saying, I want my dollar back. This isn't about refunding money. This is not a consumer action. This is about the fact that they used inflated revenues... No, I understand y'all aren't consumers, and I'm thinking that that would be the right plaintiff in the case. No, because what they did here... Y'all are the owners. You benefited from the overcharging. It's the consumers who lost. Why isn't that so? We're not the owners. Yes, you're the shareholders. Shareholders own the company. I'm sorry. Maybe I missed something in college. That's what I learned. You're absolutely right. My apologies. Well, the owners of the company were given false information about the value of the company based on inflated revenues and inflated earnings. That they haven't had to pay back. It's not a payback. It's that the value of the company was adjusted once the truth about those inflated revenues and earnings... So they wouldn't have held on to it in their portfolio. I'm sorry? They wouldn't have held on to it in their portfolio had they known that this was going to occur. Had they known the true value of Whole Foods. That's the injury to your client. They have this in their portfolio for their retirement people, right? Correct. And the company was incorrectly valued based on false revenues and false earnings. Can you answer questions about Scienter, please? How is there Scienter here? And if the Scienter falls, then all the case falls, right? Because the 20 falls if the 10B falls, right? So there are two important points there. So one is the most straightforward path to Scienter is that John Hempfling was the company's designate throughout the California negotiations that led to a consent decree and requirement to change practices and throughout the New York investigation that also led to a consent decree and a requirement to change practices. He was the company's agent and he was the company's lawyer. His knowledge is directly imputed to Whole Foods. What he knew, Whole Foods knows, right? So Whole Foods, whether or not the overcharging was intentional, and this is important, whether or not Whole Foods knows that the overcharging was intentional, Whole Foods knows that there's overcharging, which means that Gap says those dollars cannot be recognized as revenues and earnings. So his Scienter binds the company. With respect to the officers, we know that CEOs Mackey and Robb and CFO Flanagan signed SOX certifications saying that the financial statements accurately reflected Whole Foods financial condition and also saying that they were given, they were designed, their internal controls were designed to give them material, make sure they knew about material information and to make sure that they had, there was reliability of the financial reporting. So there's that on the internal controls. And then we have this CEO committee, this is unusual, but we have the CFO Flanagan saying, this group of people operate as a CEO committee and her quote is, it's extremely rare for any of us to make a decision of any consequence without consulting the full team. So at a minimum, even if the court doesn't find that those facts, I mean, our position is those facts are sufficient to plead Scienter as to that CEO team. But at a minimum, they plead control person liability of that team. That's the team that is controlling Whole Foods. Thank you, Your Honor. Thank you, Your Honor. May it please the court. Gregory Casas for the defendants below. Your Honor, the district court dismissal of plaintiff's second minute complaint with prejudice was correct and should be affirmed for three reasons, many of which were touched upon in the opening argument. First, plaintiff has failed to plead with specificity and particularity that there was a claim under the PSLRA. Second, plaintiff has failed to plead Scienter. Slow down a little bit. Sorry, Your Honor. Failed to plead Scienter with particularity as to either Whole Foods or the individual defendants. And third, plaintiff did not adequately allege loss causation. So again, failure to plead falsity, failure to plead Scienter and failure to plead loss causation. With regard to failure to plead falsity, Your Honors, there are three categories, as we One is the GAP, alleged GAP violations. As pled, these GAP violations are general and insufficient to plead falsity. Second, we also heard about these affidavits. These are the mall affidavits that were filed up in the Southern District of New York. These affidavits do not support plaintiff's allegations on their face. And so plaintiff's interpretation of them is incorrect and can be determined on their face without any further discussion or fact finding. And third, plaintiff's reliance on defendant's comments regarding transparency, price quality, these aspirational statements. These aspirational statements are inactionable as a matter of law. Turning to GAP, plaintiff claims that because Whole Foods sold these prepackaged food items that had an inappropriate weight, Whole Foods must have misstated its earnings and overstated its revenue. But plaintiff's claim is too in the record, it's page 928 of the record with regard to the dismissal of the first amended complaint. And then again on page 1390 of the record with regard to the dismissal of the second amended complaint. Plaintiff only makes allegations of these large scale and systemic misweighings, but the plaintiff needed to, but presented no particularized factual allegations from which it could draw the inference that Whole Foods statements of financial performance were false. Plaintiff does not assert that Whole Foods sales, net income, or gross revenues were factually different from what was actually reported. Okay, so if I go and I buy the chicken that is represented to be $9 a pound for chicken, and it's represented to be 1.1 pounds or whatever the math are, I pay $10, but really it was only a pound and I should have only paid $9. But I take it home, I eat the that $10 or not? Whole Foods has earned the $10 you paid for the chicken that you actually purchased. The issue becomes, Your Honor, under the gap analysis, is that $1 material that would require the financial statements to be restated in some way, shape, or form. We have no evidence that that $1 was material. We have no evidence that any of the transactions that we're talking about here, because plaintiff has not pled any particular transactions, that there's any materiality here that would require the restatement of the financial statements. Is there any evidence of massive coming back and saying, you know, I've been buying chicken here for a year and found out it was under, you know, it was overpriced and I want my $100 back for the 100 chickens I bought that were misweighed? No, Your Honor, the record only relates to the New York City Department of Consumer Affairs press release, the consent order under that New York City Department of Consumer Affairs investigation, and then the settlement document that was filed in California. There is no particularized information with regard to falsehoods. Those are all futuristic and those fines, in my view, are extremely low by comparison to the overall revenue of Whole Foods. I mean, they're dropping the bucket, so to speak. But as far as the consumer, the person who's actually been harmed by this conduct, has there been any kind of mass seeking of the money back by these consumers coming in? On an informal basis, Your Honor, no. I'm not aware of anyone coming into the stores demanding on mass we want our dollar back for this pound of chicken. There is the New York litigation, Your Honor, yes. What is defective about the deferential? Does it all come down to materiality? I believe it does, Your Honor, and I think Judge Yackel thought that as well. If you look at the record at page 928, the district court talks about the fact that it's not clear as to what amount of revenues Whole Foods improperly recognized. There's nothing specific in this record that describes exactly what it is that Whole Foods might have allegedly improperly recognized. The mall affidavits that counsel referred to earlier, these are, they're misconstrued by the plaintiffs here. The affidavits, and you can look at them in the record, they say what they say, and the district court actually, the district court properly interpreted them and determined they were not an admission of $120 million worth of aggregate sales and inventory data across very broad categories or product lines based upon these broad categories and hypotheticals set forth in the district, I'm sorry, in the New York City Department of Consumer Affairs press release. Mr. Maul did not parse the press release. He did not have to parse the press release for what he was tasked with. No, it's assuming arguendo the plaintiff's claim is correct, which is the big arguendo, this is the amount of money that would be involved. I mean, that's all they're saying in an affidavit like that. That is correct. But that's not saying they are correct. That's correct, Ron. I mean, that's true when we're looking at the $75,000. The defendant who removes is not saying I owe the plaintiff $75,000. The defendant is saying the plaintiff is making allegations that are $75,000 or more. And that's what they say in removal, right? That is, Your Honor. It's very typical. So it's not conceding, hey, I owe the plaintiff $75,000. That's correct. And because of the posture in which that affidavit or those affidavits were presented, there's no parsing transaction by transaction, which would then lead to some sort of claim or allegation that these 50 transactions suddenly become material and now there's a violation of GAAP. You can't get from the Maul affidavits to the pleading required under the PSLRA. The plaintiff is trying to make that leap. I'm interested, and Judge King asked a series of questions. I mean, it seems to me that unless you're intentionally going around misweighing, like you, the President, have said we will misweigh and this is how you're going to do it, you get the $10 on the chicken. You thought you made the $10. You report the $10. Now you found out it should have been $9. What is your answer to the GAAP question that Judge King asked counsel opposite? Yeah, what is the GAAP treatment? How should that have been reported? Your Honor, my understanding, and based upon what I've seen here in the record and the research, the only time that the financial statements would have to be restated would be as if there's a material difference between the revenue that was actually earned and what actually transpired at the store level. There's nothing in the record here that shows that there's a difference in the earnings in this particular two years when these fines were alleged. In California, you have $800,000 in fines. In New York City, you have $500,000 in fines. On their face, sure, that's a large amount of money, but the revenue each year was over $14 billion, and that's what it would be. I said it was a drop in the bucket. Not to me personally, if I had to personally pay it. I didn't mean that. But relative to Whole Foods' overall income, it's a drop in the bucket. Exactly, and there's nothing in the record here, and there's nothing that I'm aware of, that shows exactly how much we're talking about as far as the revenue that's related to the 89 transactions that might have existed, the 100 transactions. We have no idea how many transactions we're talking about here because there's nothing in the record that specifically shows how many transactions occurred where there was a misweighing. We have no idea. Opposing counsel says it doesn't matter whether or not there needed to be a restatement or any kind of correction. That's not part of this inquiry. It incites the First Circuit for that. Can you elaborate on that? Also, have we ever adopted that position of the First Circuit, if that is indeed the First Circuit's position? I'm not familiar that this Circuit has adopted that position. I do think that you have to look at materiality. You have to look at the idea of whether there should have been a restatement, because otherwise there is no violation here. If there is nothing wrong with the financial statements from a materiality perspective. What has the First Circuit said about this? Am I wrong that the opposing counsel said the First Circuit says you don't have to look at that? Your Honor, I can't specifically tell you. What I know about the case that the opposing counsel is talking about. Off the top of my head, Your Honor, I do not. Okay. Thank you. That's fine. Thank you, Your Honor. I will tell you that, and I will switch to CNTR, because that was raised with regard to what did John Hemphling know, and therefore what did the company know? First of all, we don't dispute that Mr. Hemphling was their attorney in California and New York, nor do we dispute that at the time he was global head of litigation. The issue becomes whether he was an officer of the company, and they assume that. He is their attorney, and so what he knew, sure, is imputed back to the company. But then we have to turn and look at, okay, what is it that he actually knew? And what he knew was exactly that. He knew that there was an investigation in New York. He knew there was an investigation in California. He knew there were misweighings, and he knew that there was a change of Whole Foods programming and policy as a result of California and New York. But you can't conflate knowledge into CNTR. And this Court has spoken to that in the Rosenzweig opinion at 332 F2nd I'm sorry, F3rd 854. So just because there was knowledge by the attorney doesn't mean that this all of a sudden turns into CNTR. And I would also point out that what plaintiff seems to be doing here is trying to ex post facto into CNTR. And the Diodas case from 2016 at 5th Circuit, 810 F3rd 951, prevents that. You can't look back and say, oh, because that happened, we now believe that there was CNTR. Lorman talks to that as well. The fact that something turned out badly does not mean that a defendant knew earlier that it would later turn out badly. So just because these statements with regard to all these different financial statements in 2013, 2014, 2015, suddenly you can't look back and say, oh, there was an investigation, so therefore there's CNTR now that I knew that those statements were false when I made them. You can't just jump to that conclusion. And that's what plaintiff is trying to do here with regard to Mr. Henflin. What's the easiest path that you see for the Court to affirm the District Court? I think there's a three-pronged approach that the District Court set forth that I think this Court can easily affirm, which is there was a failure to plead falsity with specificity as required by the PSLRA. There is no finding of CNTR here. There may be knowledge, but there's no CNTR. And you can't bootstrap the knowledge of Mr. Henflin into CNTR with regard to not only the company but also the individual defendants. And there is no loss causation. So I think on those three grounds, this Court can affirm that. But is one particularly, because any one, at least a second one, would all of them be good enough for the whole, each one of them be good enough? I know the CNTR would be, but would one in three be good enough on their own, each one of them? I believe so, because you have multi-prongs with regard to a claim, a plausible claim under the PSLRA. I think there's four or five different things you must plead properly in order to get past the motion to dismiss stays. If you don't plead any one of them, then you're out. And with regard to loss causation, for example, that was another issue that was raised by plaintiffs' counsel. Loss causation here is important. They're putting too much on the statements of Mr. Gallo, who talked about the negative publicity during that 29th, 2015 analyst call. The analyst call simply was the disclosure of the fact that a risk factor that had been disclosed had actually occurred. Whole Foods' 10-Ks and other financial statements that are filed with the SEC all talk about the fact that our revenues could be impacted by negative publicity. And negative publicity could mean any whole other  with regard to bad service, or in this case, could be with regard to improper weighing. As Judge Haynes pointed out, we were Twitter shamed. The Twitter shaming here is what caused the loss. It's not as if Mr. Gallo said that there was any new information with regard to finally disclosing a falsity. He did not say that we have to restate our financial statements because they never did and never had to. At most, he provided information that led to speculation by investors, and that caused the drop in price. A plaintiff cannot hide from the fact that... And that's kind of become an increasing risk with companies in general. Their CEO makes a remark that's inappropriate and their stock falls. Somebody high up in the company is charged with sexual harassment, the stock falls. And what you said, that's what you're warning about in your filings, is this kind of thing has just become much more common because news is just much more out there maybe than it was, say, when I was growing up. I think that's right, Your Honor. And for example, when Whole Foods discussed the California settlement in a letter to its investors and its customers, the stock price did not drop. After the New York City Department of Consumer Affairs issued its press release, the stock price did not drop. When Walter Robin John Mackey got on YouTube and presented a video that explained that there had been mistakes and they admitted those mistakes, the stock price didn't drop. The stock price dropped when there was a discussion of a risk factor, negative publicity. If you look at the In re Omicron case out of the Second Circuit, 597 F3, 501, that court focuses on the fact that loss causation is not adequately alleged, where the stock price only declines in response to a later negative characterization of previously disclosed news. And that's what we have here. There was no new information that was provided with regard to the investigations or the fines on that analyst call. It was simply a discussion of the fact that there was negative publicity and a negative impact. I understand the Aldridge case, which is just because you haven't confessed and restated your financials doesn't mean you win. But has any accountant said they should restate their financials? I'm not aware of anything, and there's nothing in the record that says that, Your Honor. Do you have anything else, Counsel? One other point, Your Honor, very briefly. Counsel, for plaintiffs, referenced the fact that there was these settlements and there was admissions of overcharging. That might be with regard to paying of a fine, but the consent decree in California and the consent order in New York, Whole Foods specifically denied liability. And based on the law, those denials of liability have to be taken as true, and they cannot be used against Whole Foods in this kind of a proceeding. Thank you, Counsel. Just quickly on falsity and then scienter and lost causation. So on falsity, the Aldridge quote is on pages 21 to 22 of the reply brief, the point being exactly as Judge Haynes explained, that a company doesn't have to admit their conduct in order for us to plead falsity. The clearest path to reversing on falsity here is the gap violations. This Court and central laborers said that identifying a statement with particularity, and the Plotkin decision says the same thing, identifying the who, what, where and why of a statement pleads falsity. Central laborers says that identifying a gap violation pleads falsity. And I heard Counsel talk about the fact that in the hypothetical, the $10 was earned. That is not what gap says. Gap says the money isn't earned in the first place. And this Court's decision in Berry says that where defendants disagree with the accounting violation or want to claim that they properly accounted for something in contradiction to what's alleged in the complaint, that has to await summary judgment. That is not properly considered at the pleading stage. So the gap statements by Whole Foods are pled with particularity on falsity. On CNTER. My problem is they collected the $10. So how does gap require you to report that? And that's your burden. You have to plead that we collected $10, we only should have collected $9, and gap requires us to report that this way. They've got to report it some way. We've pled it at paragraphs 124 to 127 of the complaint. Whole Foods, in order to comply with gap, couldn't just say this is the amount of money we managed to get. Whole Foods had to say these are dollars that we earned. In order to recognize them as revenues, they had to say they were earned. I understand the Court seems to not agree with the gap rule, and certainly defense counsels. I spent my whole life agreeing with gap rules. I do understand gap rules, but I don't get it. I've never dealt with a situation where you have a dollar per transaction that you took in and you shouldn't have. So how do you account for that under gap? And that's your burden. And you know that under gap there are rules about the timing of when dollars can be recognized and about which dollars can be recognized. And gap specifically says... What do you say in this record? How did gap require this transaction multiplied by however many there were be reported? Across California, across New York. What gap says is they could only recognize dollars that were earned... I understand. So they should not have reported more than nine. How do they report the dollar? That's a liability? Do they create a reserve? What do they do? What does gap require? You've got to account for it somehow if it was taken in. They either should have recorded it as gross revenues and perhaps recorded a liability or what? You're the plaintiff. I am the plaintiff. And I have met my burden by pleading that the $10 were not earned. In your hypothetical, only $9 were earned. $10 were collected, but only $9 were earned. And so when I go to the public as Whole Foods, if I say, if I recognize $10 as revenue, that is a false statement. Because the gap rules in those paragraphs of the complaint say, I only earned $9. I collected $10, but I only earned $9. And that's why it's a false statement alleged with particularity under this court's decisions in Central Laborers and Berry and Plotkin. The easiest path to see enter is through the knowledge of John Hemphling. He was the company's lawyer. What he knew over five years in investigations in two of Whole Foods' largest markets, what he knew is attributed to the company. It doesn't matter if the overcharging was intentional. He knew that there was overcharging. They admitted it. In fact, CEO Rob admitted it after the California consent decree. They admitted it and agreed to company-wide changes after the New York consent decree. That knowledge is attributed to Whole Foods.